# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA,
        Plaintiff,

-vs-                                          Case No. 6:06-cv-1281-Orl-18KRS

ENDOTEC, INC.,
MICHAEL J. PAPPAS,
FREDERICK F. BUECHEL,
JARED PAPPAS,
        Defendants.

## ORDER

THIS CAUSE comes before the Court upon remand from the United States Court of Appeals for the Eleventh Circuit. United States v. Endotec, Inc., 563 F.3d 1187 (11th Cir. 2009).

### I.    BACKGROUND

A full recitation of the underlying facts can be found in this Court's prior Order of April 30, 2008. (Doc. 100, filed Apr. 30, 2008.) Briefly, the United States of America ("the Government") brought this civil action seeking a permanent injunction against Endotec, Inc. as well as Michael Pappas and Frederick F. Buechel, its two owners (collectively "Defendants"). The Government alleges that Defendants violated the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq. by (1) manufacturing and distributing adulterated ankle, knee, and jaw devices, and (2) exceeding the scope of an approved clinical study of an ankle device. After a bench trial, this Court enjoined Defendants from manufacturing and distributing the knee devices but refused to do so for the ankle and jaw devices. This Court further found that

Defendants had not violated the clinical study of the ankle device. United States v. Endotec, Inc., No. 6:06-1281, 2008 U.S. Dist. LEXIS 35427 (M.D. Fla. Apr. 30, 2008). The ankle device at issue is the Buechel-Pappas Total Ankle Replacement System ("B-P Ankle") and includes: (1) all ankle devices distributed by Defendants for use in patients beyond the scope of the clinical study for the B-P Ankle, and (2) all ankle devices distributed as "custom" or "surgeon specials."

On appeal, the Eleventh Circuit affirmed this Court's decision regarding the knee and jaw devices. As to the ankle device, however, the court of appeals reversed this Court's decision and remanded the matter in two respects. First, the Eleventh Circuit found that this court abused its discretion in denying the Government's request for a permanent injunction. Endotec, 563 F.3d at 1197-1200. Second, the Eleventh Circuit determined that this Court employed faulty reasoning in finding that Defendants had not violated the scope of the clinical study. Id. at 1200-03. On April 21, 2009, this Court entered a permanent injunction prohibiting Defendants from manufacturing, packing, labeling and distributing the B-P Ankle. This Court also requested that the parties provide supplemental briefing addressing: (1) whether Defendants violated sections 21 U.S.C. §§ 351(i), 331(q) through the manufacture and distribution of the B-P Ankle outside the IDE clinical study based on the record evidence; (2) whether this issue as to the IDE study is now moot in light of the fact that the Food and Drug Administration ("FDA") has lifted the Application Integrity Policy ("AIP"); and (3) any other issues related to the IDE clinical study that may bear upon the Court's ultimate disposition. (Doc. 106, filed Apr. 21, 2009.)

## II. DISCUSSION

*A. Regulatory Framework*

The FDCA provides that certain devices, such as the B-P Ankle, are subject to "premarket approval to provide reasonable assurance of it safety and effectiveness" before it can be shipped in interstate commerce. 21 U.S.C. § 360c(a)(1)(C). Because these devices must be shipped in interstate commerce in order to obtain premarket approval, however, the FDCA allows for an "investigational device exemption" ("IDE"). 21 U.S.C. § 360j(g). The exemption waives the prohibition on interstate shipment of a qualifying device "and permits the investigational use of unapproved devices by experts qualified by scientific training and experience to investigate the safety and effectiveness of such devices pursuant to protocol imposed by the FDA." Endotec, 563 F.3d at 1200-01.

"To obtain an IDE exemption. a manufacturer must satisfy the requirements of 21 U.S.C. § 360j(g) as well as 21 C.F.R. § 812.20." Id. at 1201. Section 331(q)(1) of the FDCA expressly prohibits the failure or refusal to comply with any of the IDE requirements prescribed under § 360j(g). Furthermore, a failure to comply with the IDE requirements renders the device adulterated, and the FDCA proscribes the introduction into interstate commerce of any adulterated device. See 21 U.S.C. § 351(i) (defining device as adulterated if it fails to comply with IDE requirements); 21 U.S.C. § 331(a) (prohibiting the introduction or delivery for introduction into interstate commerce any adulterated or misbranded food, drug. device, tobacco product or cosmetic).

*B.     Is a Possible Violation of 21 U.S.C. §§ 331(q)(1) and 351(i) Moot?*

Article III of the Constitution provides that federal courts may only consider active cases or controversies. U.S. Const. art. III, § 2. A case is moot, and therefore no longer an active case or controversy, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). Put differently, "the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Ariz., 520 U.S. 43, 68 n.22 (1997).

After a 2001 inspection by the FDA in which numerous violations of the IDE were found, the agency issued Endotec an Application Integrity Policy hold ("AIP"). Under this policy, the FDA would defer review of further submissions by Endotec until it addressed the deficiencies identified in the inspection. On November 14, 2005, the FDA conditionally lifted the restrictions of the AIP to allow Endotec to initiate new clinical trials. (Doc. 111 at 4.) The conditions attached to the AIP removal were that Endotec had to submit a revised IDE protocol and submit to an FDA inspection to ensure the integrity of the clinical study. To date, Endotec has not complied with these conditions. As a result, the AIP has not actually been lifted. Nonetheless, as discussed below, in the event that the AIP was lifted and the clinical trials resumed, Dr. Buechel still violated the terms of the IDE two years later in 2007 when he implanted an ankle device despite not being an authorized investigator under the IDE.

Defendants further argue that the case is moot because a decision has been made to voluntarily abandon the B-P Ankle as a copy of it is currently undergoing clinical trials. As a

-4-

general matter, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citation omitted). When injunctive relief is sought, however, a claim may become moot if: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur; and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Reich v. OSHRC, 102 F.3d 1200, 1201 (11th Cir. 1997) (quotation and citation omitted). In evaluating the first element, the Court considers the following factors:

> (1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether in ceasing the conduct, the defendant has acknowledged liability.

Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1184 (11th Cir. 2007). "The formidable, heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." Id. (quotations and citations omitted).

Here, Defendants fail to meet the first element.[1] The notion that current market conditions preclude the continued production and distribution of the ankle device does not make it absolutely clear that Defendants have totally abandoned their allegedly unlawful behavior. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) ("A case might become moot if subsequent events made it absolutely clear that the allegedly

---

[1] The Court, therefore, will not address the second element.

wrongful behavior could not reasonably be expected to recur."). The record contains evidence of hundreds of violations ranging from shipments to implantations. Endotec, 563 F.3d at 1191-92. It is impossible to characterize this behavior as isolated, unintentional, or reluctant. To the contrary, Defendants' conduct constituted a "continuing practice" that cautions against mootness. Sheely, 505 F.3d at 1185. And while Defendants cessation appears to have been spurred by economic reasons independent of this litigation, they have continually failed to concede any wrongdoing and are still urging the validity of their actions. Moreover, as a practical matter, the unpredictability of the market for orthopaedic implants and that of the other pending clinical study means that the Government cannot be sufficiently reassured that Defendants will comply with the FDCA's statutory prescriptions. If the demand for the B-P Ankle outstrips the supply of the current clinical trials, there is nothing in the record to indicate that Defendants would not step in to fulfill that need. What's more, Defendants would have an even greater incentive to reenter the market in the event that the current clinical study is unsuccessful.

The same is true for Defendants' argument that the Eleventh Circuit failed to hold the government to its burden of showing why a permanent injunction is necessary despite the remedial measures implemented.[2] (Doc. 108 at 13.) This is nothing more than a recasting of Defendants' voluntary cessation argument. The Supreme Court has explained that in a public

---

[2] In making this argument, Defendants misperceive this Court's role. If Defendants feel that the Eleventh Circuit has erred on a critical issue then their outlet for relief lies elsewhere. In any event, the Court of Appeals explicitly noted it was Defendants' burden to show compliance with the IDE and not the Government's burden to show otherwise. Endotec, 563 F.3d at 1195. Additionally, it would be hard for the Government to show how the remedial measures were defective when the Defendants still have not disclosed what they were.

enforcement action, the mere possibility of a recurrent violation "together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953). Because Defendants refuse to expound on what the remedial measures implemented actually are, their assertion fails to erase the possibility of their resumption of illegal activity. Defendants implementation of some vague "remedial measures," therefore, does little to eliminate the likelihood of recurrence.

Similarly, Defendants' contention that the sale of Endotec in January of 2009 renders the case moot fails. (Doc. 108 at 4.) To be sure, a case or controversy may become moot when a defendant is divested of responsibility for the challenged actions during the pendency of litigation. See Miccosukee Tribe of Indians of Fl. v. So. Everglades Restoration Alliance, 304 F.3d 1076, 1081 (11th Cir. 2002) (denying claim for injunctive relief as moot against organization and its director when the organization had dissolved). When this occurs, the case becomes moot because either the plaintiff is no longer exposed to personal injury by the named defendant, or because a particular defendant can no longer comply with the relief sought to be imposed. See 15 James Wm. Moore et al., Moore's Federal Practice § 101.94[3].

This, however, is not the present case. The Government, on behalf of public health and safety, continues to be exposed to harm by the individual defendants. Defendants' assertion concerning the sale of Endotec says nothing about any inventory under their control or their ability to continue to manufacture and implant the ankle device. Moreover, this is not a situation where the Court is being asked to prevent an event that has already occurred. The individual defendants have failed to put forward anything that would indicate an inability

comply with a permanent injunction preventing the distribution of the B-P Ankle. Thus, the issue of whether Defendants violated the IDE is not moot.

C.      *Did Defendants Violate 21 U.S.C. §§ 331(q)(1) and 351(i)?*

Defendants originally applied for and received conditional approval for an IDE study of the B-P Ankle in 1997. Two years later, in May of 1999, Defendants received full approval of the IDE for 109 patients. Full enrollment for the IDE was reached in 2001.

The Government maintains that Defendants violated the FDCA by failing to comply with numerous IDE regulations. Specifically, the Government points to evidence in the record that one of the clinical investigators, Dr. Feldman, implanted seventeen devices into seventeen different patients and ten more as "surgeon specials" completely outside the study, all without notifying Defendants.[3] Moreover, Dr. Buechel implanted 218 devices despite the fact that he was not an authorized investigator under the IDE clinical study. An FDA inspection also found numerous other regulatory violations. These include: employing faulty record keeping in that it was impossible to track the 109 authorized implants out of the 4000 in Endotec's database; selecting investigators with no prior experience conducting clinical studies; enrolling subjects in the study who failed to meet the clinical criteria; failing to take action when investigators submitted inadequate documentation of surgical follow-up; and failing to address discrepancies in investigators' reports. (Doc. 111 at 6.)

---

[3]The term "surgeon specials" is one coined by the Defendants' and has no recognized legal meaning. To the contrary, as the Eleventh Circuit pointed out, this Court found that "surgeon specials . . . and the purported custom ankle devices manufactured and distributed by the [Defendants], are one and the same." Endotec, 563 F.3d at 1189.

The most damaging evidence offered against the defendants, and that emphasized by the Eleventh Circuit, was Dr. Buechel's admission that he implanted the device on an unknown number of patients prior to receiving a warning letter from the FDA in 2002 and even occasionally since then. Endotec, 563 F.3d at 1201. Specifically, this Court originally found that

> Dr. Buechel admitted that he is not a clinical investigator for the B-P Ankle and that means he cannot implant B-P Ankles pursuant to the approved IDE. However, Dr. Buechel implanted B-P Ankles as surgeon specials until 2002 when FDA issued its warning letter to Endotec. Since 2002, Dr. Buechel has only implanted what he describes as custom ankle devices. Dr. Buechel admitted that in April 2007, he implanted an ankle device in which all the component numbers began with "05," indicating that it was the standard B-P Ankle. Dr. Buechel offered that the particular situation must have been an emergency situation. In other situations, Dr. Buechel used components that had been originally manufactured for another patient because it offered the patient the best fit.

United States v. Endotec, Inc., 2008 U.S. Dist. LEXIS 35427, at *18.

In response, Defendants argue that §§ 331(q)(1) and 351(i) were not violated because any B-P Ankles manufactured and distributed outside the IDE were custom devices. (Doc. 108 at 6-10.) The Eleventh Circuit, however, expressly rejected the argument that the B-P Ankles manufactured and distributed after 2002 were custom devices. Endotec, 563 F.3d at 1201 n.16. On one occasion an FDA inspector observed that after the shipment of a custom ankle device had been returned by the patient, it was merely relabeled and repackaged before it was shipped to another patient. This argument also willfully ignores Dr. Buechel's admission that he implanted a standard version of the ankle device as late as 2007. Defendants' argument that the devices distributed outside the study were not meant to determine their safety and effectiveness

does not excuse them from exceeding the study's parameters. (Doc. 108 at 6.) The purpose of the IDE is to foster the development of useful devices by establishing their safety and effectiveness. 21 U.S.C. § 360j(g). To measure the IDE's application based on the intention of the sponsor would be to render the study's limits pointless. Defendants have therefore failed to rebut the record evidence that adulterated ankle devices were distributed well after the IDE reached full capacity in 2001. Accordingly, Defendants have violated 21 U.S.C. §§ 331(q)(1) and 351(i).

### D. Is a permanent injunction appropriate?

Defendants argue that even in the event of statutory violations, injunctive relief is not warranted. Section 332 provides that "[t]he district courts of the United States . . . shall have jurisdiction, for cause shown, to restrain violations of [331]." 21 U.S.C. § 332(a). Traditionally, a court will grant equitable relief if the moving party shows: (1) success on the merits; (2) irreparable injury will be suffered in the absence of an injunction; (3) the injury to the movant outweighs any damage the injunction will cause the opposing party; and (4) the injunction will be in the public interest. Endotec, 563 F.3d at 1194.

As the Eleventh Circuit has noted, when it comes to statutorily authorized injunctions, "no overarching principles are readily apparent." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1099 (11th Cir. 2004). At least in the context of the Emergency Price Control Act of 1942, 50 U.S.C.S. § 901 (repealed 1956), the Supreme Court has taken the view that the traditional equitable factors should be satisfied before issuing a statutorily authorized injunction. Hecht Co. v. Bowles, 321 U.S. 321, 330 (1944) ("[I]f Congress desired to make such an abrupt

departure from traditional equity practice as is suggested, it would have made its desire plain."). On the other hand, the Supreme Court has also held that in addition to showing a statutory violation, "[t]he necessary determination is that there exists some cognizable danger of recurrent violation." W.T. Grant, 345 U.S. at 633.

By its terms, § 332(a) merely grants district courts with the discretion to issue an injunction prohibiting further violations of the FDCA; it does not mandate it. In the absence of further congressional guidance, courts have taken different approaches towards exercising this discretion. Endotec, 563 F.3d at 1194 n.9. While some courts have held that a violation of the FDCA alone is enough to justify injunctive relief, others have applied hybrid standards incorporating both the statutory violation and one or more other factors. Compare United States v. Hoxsey Cancer Clinic, 198 F.2d 273 (5th Cir. 1952);[4] United States v. Universal Mgmt. Servs., 999 F. Supp. 974, 977 (N. D. Ohio 1997) (noting that when a device is found to be adulterated, that "alone entitles the government to the injunctive relief it seeks.") (quotation omitted); and United States v. Articles of Food and Drug, 441 F. Supp. 772 (E.D. Wis. 1977) (holding that no further showing beyond a statutory violation is required before injunctive relief can be granted) with United States v. Odessa Union Warehouse Coop., 833 F.2d 172, 175-76 (9th Cir. 1987) (considering the public interest as well as the likelihood of recurring violations) and United States v. Diaulse Corp. of Am., 457 F.2d 25 (2d Cir. 1972) (presuming public harm but considering the likelihood of continuing violation).

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the United States Court of Appeals for the Fifth Circuit handed down prior to the close of business on September 30, 1981.

Under the approach requiring only a statutory violation, the Eleventh Circuit's opinion in this matter and this Court's discussion in the previous section make clear that Defendants' violation of § 331 entitles the Government to an injunction under § 332(a). See Endotec, 563 F.3d at 1196-1200.

The Court further finds that injunctive relief is appropriate under a modified standard as well. As an initial matter, the Court is not aware of any decision requiring the Government to establish irreparable injury before issuing an injunction prohibiting further violations of § 331. See, United States v. Nutri-Cology, Inc., 982 F.2d 394, 398 (9th Cir. 1992); United States v. Spectro, 544 F.2d 1175, 1181 (3d Cir. 1976); Diapulse, 457 F.2d at 28 (2d Cir. 1972) (citing cases); United States v. Livdahl, 356 F. Supp. 2d 1289, 1290-91 (S.D. Fla. 2005); United States v. Rx Depot, Inc., 290 F. Supp. 2d 1238, 1246 (N.D. Okla. 2003); United States v. H.W. Andersen Prods., Inc., No. 2:95cv00315, 1997 U.S. Dist. LEXIS 3080, at *4 (M.D. N.C. Jan. 24, 1997); United States v. Kasz Enters., Inc., No. 930455P, 1994 U.S. Dist. LEXIS 8597, at *32; (D. R.I. May 6, 1994); United States v. Richlyn Labs., Inc., 827 F. Supp. 1145, 1150 (E.D. Pa. 1992); United States v. Pro-Ag, Inc., 796 F. Supp. 1219, 1231 (D. Minn. 1991). This principle reflects the underlying difference of purpose between an injunction sought by the sovereign pursuant to a statute and that sought by a private litigant. This difference is the pursuit of the public interest. Hecht Co. v. Bowles, 321 U.S. at 330 (explaining that it is "the standards of the public interest, not the requirements of private litigation, [that] measure the propriety and need for injunctive relief"). Because "the passage of the statute is itself an implied

finding by Congress that violations will harm the public." Nutri-Cology, Inc., 982 F.2d at 398, the Court sees no reason to deviate from this approach and will not do so.

For the same reasons that establishing irreparable injury is not required, many courts also do not balance the equities. Universal Mgmt. Servs., 999 F. Supp. at 977; Kasz Enters., Inc., 1994 U.S. Dist. LEXIS 8597, at *32; Pro-Ag, Inc., 796 F. Supp. at 1231. Discarding this traditional factor coincides with the Supreme Court's admonition that "remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health." United States v. An Article of Drug Bacto-Unidisk, 394 U.S. 784, 798 (1969). Additionally, balancing the equities can appear to be duplicative given the implication that Congress has already struck a balance between the public interest and private defendants in authorizing the remedy. Even applying this factor, however, the injury to the public interest from Defendants' persistent violation of § 331 outweighs any damage from a properly tailored injunction. Failing to enjoin Defendants from flouting FDA regulations would leave those who received the devices beyond the scope of the IDE and potential future recipients unprotected, render any data received from the IDE itself unreliable, and "deceive the public both as purchasers and users of the device." Endotec, 563 F.3d at 1202 (quotation and citation omitted).

Finally, a number of courts, including the Southern District of Florida, have adopted the approach outlined in United States v. W.T. Grant, 345 U.S. at 633. Specifically, "the requirements for injunctive relief are met when the government establishes that [D]efendants have violated the statute and there exists some cognizable danger of recurrent violation."

United States v. Sene X Eleemosynary Corp., 479 F. Supp. 970, 981 (S.D. Fla. 1979) (quotation and citation omitted). See also, H.W. Andersen Prods., Inc., 1997 U.S. Dist. LEXIS 3080, at *4; Pro-Ag, Inc., 796 F. Supp. at 1231. Just as voluntary cessation does not deprive a court of jurisdiction, "the court's power to grant injunctive relief survives the discontinuance of the illegal conduct." W.T. Grant, 345 U.S. at 633; United States v. Medwick Labs., Inc., 416 F. Supp. 832, 833 (N.D. Ill. 1976). Establishing a cognizable danger of future violations, however, requires "more than the mere possibility which serves to keep the case alive." W.T. Grant, 345 U.S. at 633.

The Court finds that an appreciable threat of recurrent violations exists. Although evaluating the likelihood of future violations is inherently speculative and by no means taken lightly, the Court's conclusion is supported by the principle that despite the forward looking nature of injunctive relief, "[Defendant's] past conduct is a relevant factor to be considered." Offner v. Shell's City, Inc., 376 F.2d 574, 576 (5th Cir. 1967). The hundreds of devices shipped outside the scope of the IDE through 2005 as well as Dr. Buechel's implantation of the device as recently as 2007 weigh heavily in favor of granting injunctive relief. Similarly, "[i]njunctive relief is particularly appropriate in cases such as this where violations are systemic and ongoing, notwithstanding repeated warnings by the FDA." Kasz Enters., Inc., 1994 U.S. Dist. LEXIS 8597, at *34. Here, Defendants' persistent violations continued despite warnings from FDA investigators in 2002 and 2005. Endotec, 563 F.3d at 1191-92. Therefore, the Government has met its burden and a permanent injunction pursuant to 21 U.S.C. § 322(a) is warranted.

## III. CONCLUSION

Accordingly, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that this Court's previous Order of April 21, 2009 (Doc. 106) is **AMENDED** to read:

1. With respect to the B-P Ankle, Defendants violate the FDCA, 21 U.S.C. § 331(a), by introducing and causing to be introduced, and delivering and causing to be delivered for introduction, into interstate commerce articles of device, as defined by 21 U.S.C. § 321(h), that are adulterated within the meaning of 21 U.S.C. §§ 351(f)(1)(A), 351(f)(1)(B).

2. With respect to the B-P Ankle, Defendants violate the FDCA, 21 U.S.C. § 331(k), by causing articles of device to become adulterated within the meaning of 21 U.S.C. §§ 351(f)(1)(A), 351(f)(1)(B), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

3. With respect to the B-P Ankle, Defendants violate the FDCA, 21 U.S.C. § 331(q)(1), by causing articles of device to become adulterated within the meaning of 21 U.S.C. § 351(i), while such articles are held for sale after shipment of one or more of their components in interstate commerce.

4. Defendants and each of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them who have received actual notice of this Order by personal service or otherwise, are permanently restrained and enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done any act that:

A. violates 21 U.S.C. § 331(a). by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce a B-P Ankle that is adulterated within the meaning of 21 U.S.C. §§ 351(f)(1)(A), 351(f)(1)(B); and

B. violates 21 U.S.C. § 331(k). by causing a B-P Ankle to be adulterated, within the meaning of 21 U.S.C. §§ 351(f)(1)(A), 351(f)(1)(B), while such article is held for sale after shipment of one or more of its components in interstate commerce.

C. violates 21 U.S.C. § 331(q)(1), by introducing or causing to be introduced, or delivering or causing to be delivered for introduction, into interstate commerce a B-P Ankle that is adulterated within the meaning of 21 U.S.C. § 351(i).

5. Defendants and each of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert of participation with any of them who have received actual notice of this Order by personal service or otherwise, are enjoined pursuant to 21 U.S.C. § 332(a) from manufacturing, packing, labeling, and distributing the B-P Ankle device unless and until:

A.1. For the existing investigational device exemption (IDE), the Defendants submit a supplemental application requesting approval for a protocol deviation under 21 C.F.R. § 812.35(a) for the B-P Ankle in order to treat a specific patient and FDA approves, in writing, the IDE supplement: or

A. 2. There is an FDA approved application for premarket approval (PMA) filed pursuant to 21 U.S.C. § 360(e): or

A.3. FDA has received a premarket notification as required by 21 U.S.C. § 360(k) (also referred to as 510(k) submission) for the B-P Ankle and has advised Defendants in writing pursuant to 21 U.S.C. § 360c(l)(1)(A) that the device is substantially equivalent to a predicate device; and

B. Defendants submit a list(s) to FDA that includes the following information for each component or system included in the B-P Ankle in inventory as of the date of this Order, or that Defendants have distributed within one year prior to the entry of this Order: (1) the name and catalog number of the component or system; (2) a statement whether the component or system has been cleared for marketing under a premarket notification submission pursuant to 21 U.S.C. § 360(k) or is intended to be marketed under an IDE, PMA, or other FDA clearance, exemption, or approval; (3) an engineering print for the component or system; (4) the component's or system's notification/application number (i.e., 510(k), IDE, or PMA); and (5) the component's or system's quantity and lot numbers; and

C. FDA reviews the list submitted pursuant to paragraph 5.B. and notifies Defendants, in writing, that they may commence manufacturing, packing, labeling, and distributing the components and systems for the B-P Ankle that meets the requirements of this paragraph.

6. Within thirty (30) calendar days of the entry of this Order, Defendants shall establish, implement, and continuously maintain a record-keeping system that records, at a minimum, the following information for each component that comprises each B-P Ankle system manufactured and distributed by Defendants: (a) the component's or system's name, catalog number, quantity,

and lot number; (b) the name and address of the purchaser(s); (c) the date of sale; (d) a statement whether the component or system was marketed under a 510(k), IDE, PMA, or other FDA clearance, exemption, or approval; and (e) the component's or system's 510(k), IDE, or PMA number. Defendants shall submit a copy of the records kept pursuant to this system to FDA on a quarterly basis.

7. If, at any time after entry of this Order, FDA determines that Defendants have failed to comply with any provision of this Order, or have violated the FDCA or its implementing regulations, FDA may order in writing Defendants to cease all manufacturing, processing, packing, labeling, holding, and distributing of any or all device system(s), or any device(s), any of the components that comprise the finished device system(s), or any other device or component determined by FDA to be in violation of this Order, the FDCA, or its implementing regulations. FDA may also order in writing Defendants, as and when FDA deems necessary, to recall any device(s) that are adulterated or misbranded or are otherwise in violation of this Order, the FDCA, or its implementing regulations or take any other corrective action to bring Defendants and their products into compliance with this Order, the FDCA, or its implementing regulations. Defendants shall bear the costs of any recalls and any corrective actions ordered by FDA. Any cessation of operations described in this paragraph shall continue until Defendants receive written notification from FDA that Defendants appear to be in compliance with this Order, the FDCA, and its implementing regulations.

8. Duly authorized representatives of FDA are authorized, as and when FDA deems necessary and without prior notice, to inspect Defendant's facilities in order to monitor and

ensure continuing compliance with this Order. During such inspections, FDA representatives are authorized to inspect all equipment, finished and unfinished materials and products, containers, and labeling therein; to take photographs and make video recordings; to collect samples of any articles of device; and to examine and copy all records relating to the manufacture, packing, labeling, and distribution of any of Defendant's products. These inspections shall be permitted upon presenting a copy of this order and appropriate credentials. The inspection authority granted by this Order is separate from, and in addition to, the authority to make inspections under the FDCA, 21 U.S.C. § 374.

9. Within ten (10) calendar days after entry of this Order, Defendants shall provide a copy of this Order, by personal service or registered mail, to each of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them. Defendants shall also post a copy of this Order in the employee common areas at their manufacturing facility. Within thirty (30) calendar days of the date of the entry of this Order, Defendants shall provide to FDA an affidavit of compliance, based upon personal knowledge of the affiant, stating the fact and manner of compliance with the provisions of this paragraph and identifying the names and positions of all persons who have received a copy of this Order.

10. Defendants shall address all communication with FDA required under this Order to the Director, Florida District Office, U.S. Food and Drug Administration, 555 Winderley Place, Suite 200, Maitland, Florida 32751, and the Director, Office of Compliance for Devices and Radiological Health, 20904 Gaither Road, Rockville, Maryland 20850.

11. Should the United States bring and prevail in a contempt action to enforce the terms of this Order, Defendants shall, in addition to other remedies, reimburse the United States for its attorneys' fees, court costs, expert witness fees, and investigational and analytical expenses incurred in bringing such an action.

12. Defendants shall abide by the decisions of the FDA, which decisions shall be final. All decisions specified in this Order shall be vested in the discretion of the FDA, which discretion shall be reviewed, if contested, by this Court under the arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A). Review shall be based exclusively on the written record before FDA at the time the decision was made. No discovery shall be taken by either party.

13. This Court retains jurisdiction to issue such further decrees and orders as may be necessary to enforce or modify this Order and for granting such other relief as may be necessary and appropriate for the proper disposition of this proceeding.

14. All other pending motions are **DENIED** as moot.

**DONE and ORDERED** in Orlando, Florida on this ___ day of September, 2009.

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties